KLESTADT & WINTERS, LLP
Tracy L. Klestadt (TK-3591)
John E. Jureller, Jr. (JJ-4697)
Sean C. Southard (SS-2825)
292 Madison Avenue, 17th Floor
New York, New York 10017
(212) 972-3000

Attorneys for Plaintiff
Darek Hrynkiewicz, as Plan Administrator

---

| | |
|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GT BRANDS HOLDINGS LLC, <u>et al.</u> | : | Case No.  05-15167(PCB) |
| | : | |
| Debtors. | : | Jointly Administered |

---

| | |
|---|---|
| DAREK HRYNKIEWICZ, as Plan Administrator of the Estates of GT Brands Holdings LLC, GT Brands LLC, GT Merchandising & Licensing LLC, Gym Time, LLC, BSBP Productions LLC, GoodTime Entertainment LLC and Tessro LLC f/k/a REPS LLC, | : | Adv. Pro. No. [_____] (PCB) |

                              Plaintiff,     :

     -against-                               :

JOSEPH CAYRE, KENNETH CAYRE,                 :
STANLEYCAYRE, MICHAEL CAYRE,                 :
JACK J. CAYRE, GRACE S. CAYRE                :
IRREVOCABLE GRANTOR TRUST,                   :
STEVEN CAYRE IRREVOCABLE                     :
GRANTOR TRUST, DANIEL CAYRE                  :
IRREVOCABLE GRANTOR TRUST,                   :
GRACE E. CARYE IRREVOCABLE                   :
GRANTOR TRUST, JACK S. CAYRE                 :
IRREVOCABLE GRANTOR TRUST,                   :
AMIN S. CAYRE IRREVOCABLE                    :
GRANTOR TRUST, ROBERT CAYRE                  :
IRREVOCABLE GRANTOR TRUST,                   :

DAVID CAYRE IRREVOCABLE                    :
GRANTOR TRUST, JACK K. CAYRE
IRREVOCABLE GRANTOR TRUST,
NATHAN CAYRE IRREVOCABLE
GRANTOR TRUST, GRACE CAYRE
IRREVOCABLE GRANTOR TRUST,
MICHELLE CAYRE IRREVOCABLE
GRANTOR TRUST, RAQUEL CAYRE
IRREVOCABLE GRANTOR TRUST,
JOSEPH SHABOT, and ANDREW
GREENBERG,

                              Defendants.

## ADVERSARY COMPLAINT

Plaintiff, Darek Hrynkiewicz (the "Administrator" or "Plaintiff"), as the Plan

Administrator ("Administrator") of GT Brands Holdings LLC ("GT Holdings"), GT Brands

LLC ("GT Brands"), GT Merchandising & Licensing LLC, Gym Time, LLC, BSBP

Productions LLC, GoodTime Entertainment LLC and Tessro LLC f/k/a REPS LLC

(collectively the "Debtors"), by his attorneys, Klestadt & Winters, LLP, as and for his

complaint against the Defendants, Joseph Cayre ("JC"), Kenneth Cayre ("KC"), Stanley

Cayre ("SC"), Michael Cayre ("MC"), Jack J. Cayre ("JJC"), Joseph Shabot ("Shabot") and

Andrew Greenberg ("Greenberg"), and the trustees of the following family trusts

(collectively, the "Cayre Family Trusts" and together with JC, KC, SC, MC, JJC, Shabot and

Greenberg referred to as the "Defendants"): Grace S. Cayre Irrevocable Grantor Trust,

Steven Cayre Irrevocable Grantor Trust, Daniel Cayre Irrevocable Grantor Trust, Grace E.

Cayre Irrevocable Grantor Trust, Jack S. Cayre Irrevocable Grantor Trust, Amin S. Cayre

Irrevocable Grantor Trust, Robert Cayre Irrevocable Grantor Trust, David Cayre Irrevocable

Grantor Trust, Jack K. Cayre Irrevocable Grantor Trust, Nathan Cayre Irrevocable Grantor

Trust, Grace Cayre Irrevocable Grantor Trust, Michelle Cayre Irrevocable Grantor Trust, and Raquel Cayre Irrevocable Grantor Trust, alleges as follows:

## INTRODUCTION

1.      The Administrator brings this action on behalf of the Debtors' chapter 11 estates pursuant to (A) sections 544, 550 and 551 of title 11 of the United States Code (the "Bankruptcy Code") and Sections 273, 274, 275, 276 and 278 of the New York State Debtor and Creditor Law, as made applicable hereto, to avoid and recover for the benefit of the Debtors' estates certain obligations incurred and/or transfers made to or for the benefit of the Defendants (the "Transfers") in connection with the February 6, 2003 acquisition of GoodTimes Entertainment Limited., GT Merchandising & Licensing Corp, REPS Ltd., Gym Time LLC, and BSBP Productions Inc. (the "Predecessor Companies") and related transactions (the "Transactions"), and (B) sections 502 and 510 of the Bankruptcy Code, to disallow and/or subordinate the claims asserted by certain of the Defendants in the Debtors' bankruptcy cases.

2.      As set forth more fully herein, the Administrator seeks to recover damages from the Defendants since the Transfers (A) were made without fair consideration and (B) either (i) rendered the Debtors insolvent, (ii) caused the Debtors to be left with unreasonably small capital for the business in which they were engaged or were about to engage; and/or (iii) the Debtors, the Defendants and/or the Predecessor Companies (defined below) intended to incur, or believed that they would incur, debts beyond their ability to repay as such debts matured.  The Administrator also seeks to recover damages on account of the Transfers based upon the individual Defendants' intent to hinder and defraud the Debtors' then current and future creditors.

3.      As will be explained in more detail below, the Transactions were accomplished by merging[1] the Predecessor Companies into newly formed companies (collectively, the "Successor Companies"), with the Successor Companies being the surviving entities.  The Successor Companies, together with GT Holdings and GT Brands, are the Debtors who eventually filed the instant chapter 11 cases and sought to sell substantially all of their remaining assets on July 11, 2005.

## JURISDICTION AND VENUE

4.      This adversary proceeding is commenced pursuant to sections 502, 510, 544, 550 and 551 of the Bankruptcy Code and sections 273, 274, 275, 276 and 278 of the New York State Debtor and Creditor Law, made applicable herein by section 544 of the Bankruptcy Code, and Rule 7001(1) of the Federal Rules of Bankruptcy Procedure.  This is a core proceeding under 28 U.S.C. §157(b)(2).

5.      This Court has jurisdiction over this matter under the Bankruptcy Code and pursuant to 28 U.S.C. §157(a) and §1334(b).

6.      Venue in this district is proper under 28 U.S.C. §1409(a).

## THE PARTIES

### The Debtors

7.      GT Holdings is a Delaware limited liability company initially formed for purposes of the Transactions.  GT Holdings was the manager of GT Brands, and the holder of 100% of the voting interests in GT Brands.

8.      GT Brands is a Delaware limited liability company initially formed for purposes of the Transactions and was the direct or indirect owner of 100% of the membership interests in each of the remaining Debtors.

---

[1] The ownership interest of Gym Time LLC was sold.

**The Plan Administrator**

9.      The Administrator was appointed pursuant to the terms of the First Amended Plan of Liquidation (as Modified) of GT Brands Holdings LLC, *et al*. under chapter 11 of the Bankruptcy Code, dated May 19, 2006 (the "Plan"), which was confirmed by an order of the Bankruptcy Court entered September 6, 2006.

10.      The Plan became effective on October 31, 2006 (the "Plan Effective Date").

11.      Upon the Plan Effective Date, the rights, powers and duties of the Debtors and the Official Committee of Unsecured Creditors (the "Committee") under the Plan were transferred to and were to be exercised by the Administrator, pursuant to Section 6.2 of the Plan.

**The Defendants**

12.      Upon information and belief, defendant Stanley Cayre is a citizen of the United States and resident of the State of Florida, and was a former officer and shareholder of one or all of the Predecessor Companies.

13.      Upon information and belief, defendant Joseph Cayre is a citizen of the United States and resident of the State of New York, and was a former officer and shareholder of one or all of the Predecessor Companies.

14.      Upon information and belief, defendant Kenneth Cayre is a citizen of the United States and resident of the State of New York, and was a former officer and shareholder of one or all of the Predecessor Companies.

15.      Upon information and belief, defendant Michael Cayre is a citizen of the United States and resident of the State of New York, and was a former shareholder of one or all of the Predecessor Companies.

16.     Upon information and belief, defendant, Jack J. Cayre is a citizen of the United States and resident of the State of New York, and was a former shareholder of one or all of the Predecessor Companies.

17.     Upon information and belief, the Cayre Family Trusts were former shareholders of one or all of the Predecessor Companies.

18.     Upon information and belief, defendant, Joseph Shabot is a citizen of the United States and resident of the State of New York, and was a former officer and/or shareholder of one or all of the Predecessor Companies.

19.     Upon information and belief, defendant Andrew Greenberg is a citizen of the United States and resident of the State of Florida, and was a former officer and/or shareholder of one or all of the Predecessor Companies.

## **BACKGROUND**

### **The Operations and Control of the Predecessor Companies**

20.     Prior to the Transactions, the Predecessor Companies were successful companies with steadily growing income and revenue according to the available financial reporting.

21.     Most recently, for the years 1999 through 2002, the Predecessor Companies experienced considerable growth, with gross revenues increasing from $126 million in 1999, to $200 million in 2000, to $242 million in 2001, to $288 million in 2002 on the eve of the Transactions at issue in this Complaint.

22.     The Defendants were each a shareholder of one or more of the Predecessor Companies prior to the Transaction, and together were the sole shareholders of the

Predecessor Companies.  A list of the ownership interests of each of the Defendants in the Predecessor Companies is set forth in Exhibit A hereto.

23.     Upon information and belief, JC, KC, SC, Shabot and/or Greenberg were officers of these closely held Predecessor Companies and collectively managed and controlled the Predecessor Companies.

24.     Despite the reported operating success of the Predecessor Companies and lucrative positions for the Defendants who sat atop the proverbial pyramid, corporate formalities and standard management tactics were not the norm at the Predecessor Companies before the Defendants decided to market them for sale.

25.     The managing Defendants were privileged to reap the rewards of the corporate form and its limited liability, without the worries of strict financial reporting or controls.

26.     Upon information and belief, the Predecessor Companies often underreported royalties and related revenues to certain joint venture partners and other third parties with a financial interest in the revenues of the Predecessor Companies.

27.     Certain creditors were owed money on account of royalties or other profit sharing due by the Predecessor Companies before the Transactions and by certain of the Debtors following the Transactions (the "Royalty Claimants").

28.     The Royalty Claimants have asserted claims for several million dollars on account of the asserted fraud and intentional misreporting of revenues by the Predecessor Entities.

29.     Upon information and belief, as owners and/or officers of the Predecessor Companies, the individual Defendants were responsible for the misreporting of royalties and related revenues by the Predecessor Companies.

30.     Upon information and belief, the Predecessor Companies improperly calculated reserves for returns as well as bad debts, at the expense of third party creditors.

31.     Upon information and belief, as owners and/or officers of the Predecessor Companies, the individual Defendants were responsible for the improperly calculated reserves for the Predecessor Companies.

**Preparations for a Transaction**

32.     Upon information and belief, in or about early or mid-2001 the Defendants and/or the Predecessor Companies retained and engaged the investment banking firm of Barnett & Partners ("Barnett") to advise the Defendants and/or the Predecessor Companies.

33.     Upon information and belief, Barnett were engaged to provide advice related to a sale of the equity interests in the Predecessor Companies and otherwise market the Predecessor Companies for sale (collectively the "Sale Efforts").

34.     Upon information and belief, Barnett was employed on a commission fee basis such that Barnett was provided significant incentive to ensure that the highest possible price for the Predecessor Companies and the Defendants' interests in the same.

35.     Upon information and belief, in or about early or mid-2001 the Defendants and/or the Predecessor Companies retained and engaged the law firm of Paul Weiss Rifkind Wharton & Garrison LLP ("Paul Weiss" and together with Barnett referred to as the "Advisors") to advise the Defendants and/or the Predecessor Companies in connection with the Sale Efforts.

36.     Upon information and belief, during this same time period, and presumably based upon the advice of their Advisors, the Defendants took steps to formalize the business operations and management structure and tidy the corporate records of the Predecessor Companies.

37.     Upon information and belief, in or about February, 2002, JC, KC and SC executed, among other things, shareholder resolutions and written consents, for the first time electing themselves as directors of the Predecessor Companies.

38.     Upon information and belief, immediately thereafter, the newly elected board members elected themselves as officers of the Predecessor Companies, with JC serving as President, KC serving as Vice President and SC serving as Chairman, Secretary and Treasurer.

39.     Upon information and belief, JC, KC and SC served in the de facto positions of authority as senior managers and shareholders of the Predecessor Companies for over a decade of prior operations.

40.     As part of the cleanup effort, the directors and officers ratified all actions, transgressions and omissions from November 15, 1990 to that point in time.

41.     Upon information and belief during this period of time, JC, SC and KC also sought to alter the appearance of their roles as senior managers of the Predecessor Companies, by promoting and installing a group of executive managers from its existing personnel, including Greenberg (collectively referred to as the "Second Tier Management").

42.     Despite stepping back from the limelight, JC, SC and KC continued to draw lucrative compensation on the Predecessor Companies payroll in excess of $3.5 Million collectively during each of 2001 and 2002.

43.     Upon information and belief, at or about this time, Greenberg was promoted to chief executive officer of the Predecessor Companies and remained so until the time of the Transactions.

44.     Upon information and belief, Greenberg asserted up to a three percent (3%) ownership stake in the Predecessor Companies during the period leading up to the Transactions, based upon an alleged verbal understanding with certain of the other Defendants (the "Phantom Ownership Interest").

**Marketing of the Predecessor Companies**

45.     At or about the time of the aforementioned corporate housecleaning, a "teaser" style offering memorandum was prepared by the Defendants and/or the Predecessor Companies with the assistance of the Advisers and the parties began to test the market for sale of the Predecessor Companies by circulating the offering memorandum.

46.     Upon information and belief, during the diligence period and in connection with the Sale Efforts, the Predecessor Companies altered their internal financial reporting and controls.

47.     The diligence materials, including memoranda prepared by the Predecessor Companies with the assistance of the Advisors, emphasized the importance of the Second Tier Management to the operations and continued success of the companies.

48.     Along with many other parties during this diligence period, Quadrangle (GT) Capital Partners LP, Quadrangle (GT) Select Partners LP, and Quadrangle (GT) Capital Partners-A LP, Quadrangle Advisors LLC, and Quadrangle (GT) GP Investors LLC (collectively the "Quadrangle Entities") approached the Defendants and their Advisors regarding the acquisition of an ownership interest in the Predecessor Companies.

49.     After initial rounds of diligence were completed, the Advisors solicited bids from potential purchasers and the Quadrangle Entities emerged as the highest bidder.

50.     Upon information and belief, based upon the Second Tier Management's determination and specifically that of Greenberg, the Quadrangle Entities were selected as the transaction partners by the Predecessor Companies and the individual Defendants.

**Form of Transactions**

51.     Thereafter, the Quadrangle Entities and the Defendants began negotiating the terms of the acquisition of the Predecessor Companies.

52.     Initially, in or about August 1, 2002, the Quadrangle Entities, the Defendants and the Predecessor Companies entered into an Agreement and Plan of Merger and LLC Interest Purchase Agreement (the "First Merger Agreement").

53.     For reasons that are unclear, the First Merger Agreement was not consummated and the same expired in or about November, 2002.

54.     Thereafter, the parties negotiated and entered into an Amended and Restated Agreement and Plan of Merger and LLC Interest Purchase Agreement (the "Second Merger Agreement"), which contemplated the Transactions.

55.     Upon information and belief, the Second Merger Agreement provided for a significantly smaller equity commitment by the Quadrangle Entities than in the prior First Merger Agreement.

56.     Upon information and belief, GT Holdings and GT Brands were formed by the Quadrangle Entities to effect the acquisition of the Predecessor Companies.

57.     The Transactions were accomplished by merging the Predecessor Companies into the newly formed Successor Companies, with the Successor Companies being the surviving entities.

58.     Upon information and belief, the Second Merger Agreement closed on February 6, 2003 (the "Closing Date").

59.     Under the terms of the Transactions, all of the pre-transaction creditors of the Predecessor Companies remained creditors of the related Debtors, including without limitation, the Royalty Claimants.

60.     The Successor Companies were 100% owned by GT Brands, as the operating company, which in turn was 100% owned by GT Holdings, a holding company.

**Value Transferred In Transactions**

61.     Pursuant to the Second Merger Agreement, the purchase price was approximately $232,391,000 (the "Purchase Price").

62.     By and through the Transactions, approximately $143,476,000 was transferred to the Defendants (excluding Greenberg) in cash (the "Closing Cash Transfers").

63.     Upon information and belief, the Closing Cash Transfers were made to the Defendants (excluding Greenberg) on account of and/or in exchange for their respective ownership interests in the Predecessor Companies.

64.     By and through the Transactions, approximately $3,034,000 was transferred to satisfy certain loans of JC, KC and SC (the "Insider Loan Transfer").

65.     By and through the Transactions, approximately $58,575,000 in notes payable were issued by the Debtors to the Defendants ("Sellers Notes Transfer").

66.     By and through the Transactions, approximately $11,298,000 was transferred to pay the professional fees of the Predecessor Companies and the Defendants related to the Transactions (the "Seller Professional Fee Transfers").

67.     By, through or on account of the Transactions, approximately $13,348,000 in bonuses were transferred to key executives.

68.     Upon information and belief, Greenberg received a transfer of approximately $6,609,934 and Shabot received a transfer of approximately $545,801 as purported bonuses in connection with the Transactions (the "Executive Bonus Transfers" and together with the Closing Cash Transfers, the Insider Loan Transfer, the Sellers Notes Transfer, the Seller Professional Fee Transfers, and the Executive Bonus Transfers, referred to as the "Avoidable Transfers").

69.     Upon information and belief, some or all of the Executive Bonus Transfers were made to Greenberg on account of the Phantom Ownership Interest he asserted.

70.     Upon information and belief, no legal basis existed at the time of the Transactions entitling Greenberg to the ownership interest he was asserting.

71.     Certain taxes resulting from the Transactions in the estimated sum of $15,000,000 were also to be paid from the proceeds of the closing.

72.     The Transactions were funded by a combination of capital, debt and notes payable, as follows: (i) an initial capital infusion of $97.4 million by the Quadrangle Entities to GT Holdings, (ii) debt financing of $93 million received from a combination of JP Morgan Chase Bank ("Chase"), Bank of America, N.A. ("BOFA"), and HSBC Bank USA ("HSBC" and collectively referred to as the "Lenders"), and (iii) the issuance of $58,575,000 in Sellers

Notes, at an interest rate of 14% per annum, issued by GT Holdings, on behalf of GT Brands, to the Defendants (excluding Greenberg).

**Post-Closing Allocations**

73.     Following the Closing Date and continuing for several months thereafter, the Quadrangle Entities and the Debtors on the one hand, and the Defendants on the other hand, engaged in negotiations and valuations concerning the Transactions and the allocation of assets related to the same.

74.     According to the Debtors' auditors, Deloitte & Touche LLP, the Purchase Price allocation resulted in an excess of the purchase price over the value of the net assets acquired in the total sum of $161,937,000, which was recorded as goodwill on the books of the Debtors.

75.     The net result of the Transactions for the Debtors was the incurrence of roughly $217,353,000 in debt, as compared to $79,671,000 prior to the Transactions, with no significant increase in assets other than approximately $161 million in recorded goodwill.

76.     Regardless of form, the substance of the Transactions was the cashing out of the Defendants' interest in the Predecessor Companies.

**Improper Financial Disclosure**

77.     Upon information and belief, the Defendants provided inaccurate financial information to the Predecessor Companies' auditors and to their Advisors and others involved in the Transactions, including but not limited to significantly overstated profits and significantly understated costs associated with past sales, including but not limited to the revenues owed to joint ventures and royalty payments owed to vendors.

78.    Upon information and belief, the Defendants developed a general practice on behalf of the Predecessor Companies whereby they would withhold royalty payments owed to various vendors involved in the production of the Predecessor Companies' products, allegedly as security against returned product and "bad debt."

79.    However, upon information and belief, in practice, the Defendants failed to maintain a proper accounting of the returns and "bad debt", resulting in many vendors never receiving their proper royalty payments.

80.    As a result of the foregoing, the Predecessor Companies' financial statements and balance sheets showed inflated profit, and as a result, the financial statements used in preparing the valuations of the Predecessor Companies in relation to the Transactions intentionally reflected costs that were significantly lower than actual costs and profits that were significantly higher than actual profits.

81.    Relying upon these inaccurate financial records, the financial projections, which served the basis for the Transactions, incorrectly showed that that the Debtors would be able to repay the increased debt obligations incurred in connection with the Transaction, and still have sufficient working capital to pay its ordinary course business obligations and the necessary expansion costs.  In reality, though, the Transactions left the Debtors in a state of overvaluation and undercapitalization.

82.    Upon information and belief, some or all of the Defendants, as officers and owners of the Predecessor Companies, did not take sufficient steps to ensure that the Transactions were fair and reasonable to creditors and interested parties.

83.     Upon information and belief, at the request of the Lenders, the Quadrangle
Entities, by and through the newly formed GT Holdings and GT Brands, retained a company
to provide a fair value opinion in connection with the Transactions.

84.     Valuation Research Corporation ("Valuation Research") was retained to
provide such opinion and was paid a fee of approximately $45,000 to investigate the
proposed Transactions and render the opinion.

85.     Upon information and belief, in rendering its opinion, Valuation Research
relied only upon information and analyses furnished by and/or discussions held with the
Quadrangle Entities and disclaimed any responsibility for the sufficiency and accuracy of the
information that it reviewed.

86.     Upon information and belief, no disclosure as to the Royalty Claimants or
other hidden liabilities of the Predecessor Companies was made to Valuation Research.

87.     Upon information and belief, certain of the Defendants were completely
unaware of the opinion prepared by Valuation Research until well after the Closing Date.

**Post-Transaction Operations**

88.     Most, if not all of the Second Tier Management remained employed by the Successor Companies/Debtors following the Closing Date, including Greenberg and Jonathan Boon ("Boon").

89.     As chief financial officer of the Debtors following the Closing Date, Boon was responsible for certifying compliance with the loan covenants on a quarterly basis to the Lenders in accordance with the loan agreements.

90.     Boon issued such a certification for the period ending March 31, 2003.

91.     Upon information and belief, Boon continued to provide services for the benefit of JC, SC and KC and their financial interests following the Closing Date.

92.     The first interest payments were made to the Defendants (excluding Greenberg) based upon the Seller Notes on or about March 31, 2003.

93.     Upon information and belief, during the summer of 2003, Boon was terminated by the Debtors and replaced with new chief financial officer.

94.     Upon information and belief, since the termination of his employment with the Debtors, Boon has provided services for SC and his financial interests.

95.     As a direct result of the Transactions, the Debtors were quickly incapable of servicing the massive debt incurred in the Transactions.

96.     The Transactions left the Debtors insolvent, lacking in sufficient assets with which to conduct business, and undercapitalized, as their debt obligation grew exponentially overnight and interest payment obligations soared.

97.     Within a few months following the Transactions, the Debtors were out of compliance with the leverage and interest covenants under their loan agreements with the Lenders.

98.     By October 2003, the Debtors had entered into a forbearance agreement with the Lenders as a result of the continuing defaults in their loan covenants, whereby the Lenders agreed not to accelerate the principal amount until March 31, 2004.

99.     Thereafter, the Debtors negotiated a second forbearance agreement, dated March 18, 2004, whereby the Lenders agreed to not accelerate the loans until September 30, 2004.

100.    Subsequently, as of December 31, 2004, the Debtors' auditor recorded an impairment charge of approximately $168,892,000 related to the goodwill and intangibles that arose as a result of the Transactions.

101.    The Debtors received little, if any, benefit as a result of the Transactions, receiving only $322,000 in additional working capital before payment of Executive Bonuses and Transaction taxes, all while incurring additional debt obligations in excess of $137,678,000 (consisting of $93,000,000 owed to Lenders and $58,575,000 in Seller Notes, less $32,081,000 in prior bank loans which were repaid, plus additional liabilities of $18,184,000).

102.    Almost immediately after the transactions were consummated and consistently thereafter, the Debtors' operating performance fell below projections, and as a result, the Debtors were unable to meet their obligations under the various loan facilities, and went into default.

103.     The financial results for the fiscal year ended 2003 were well below the projections calculated from the Predecessor Companies' financial statements, and as a result, within a year's time, the Debtors were already having trouble meeting their financial obligations as incurred in the Transactions despite the past performances represented by the Defendants.

104.     In order to achieve the revenues, net income and EBITDA projected during the Transactions, the Debtors had planned to expand their operations, with a roll out of a substantial number of additional products.  This would, of course, require significant capital expenditures.  However, as discussed above, the Transactions left the Successor Companies undercapitalized with little to no capital to invest in the growth of new products and markets.

105.     On July 11, 2005 the Debtors were unable to meet their financial obligations any further, and were caused to file petitions for relief under chapter 11 in this Court.

**The Bankruptcy Cases**

106.     On July 11, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with this Court under chapter 11 of the Bankruptcy Code.

107.     The Debtors operated their business and managed their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

108.     The Official Committee of Unsecured Creditors (the "Committee") was formed on July 22, 2005.

109.     On the Petition Date, the Debtors filed a motion seeking, among other things, approval of bidding procedures and the sale of substantially all of the Debtors' assets to Gaiam, Inc. ("Gaiam"), subject to higher and better offers, pursuant to the Asset Purchase Agreement, dated as of July 8, 2005, between Gaiam Inc. and the Debtors, which was

approved by the Court on August 31, 2005, and the transaction was closed on September 13,

2005 (the "Bankruptcy Sale").

110.    The proceeds received as a result of the Bankruptcy Sale was $35 Million, or

approximately 15% of the Purchase Price of $234,391,000 in the Transaction, despite being

just thirty (30) months after the closing of the Transactions.

## FIRST CLAIM FOR RELIEF

(Avoidance and Recovery of Fraudulent Transfers of Money and Property and Preserve
Same for the Benefit of the Estates Pursuant to New York Debtor and Creditor Law §§ 273,
274, 275, and 278, and Bankruptcy Code §§ 502, 544, 550(a), and 551)

111.    The Administrator repeats and incorporates by reference the allegations set

forth in the preceding paragraphs as if fully set forth herein.

112.    The Administrator brings this claim against the Defendants pursuant to

Sections 544, 550 and 551 of the Bankruptcy Code and Sections 273, 274, 275 and 278 of the

New York Debtor and Creditor Law.

113.    The Avoidable Transfers constitute a transfer or transfers of an interest or

interests in the Debtors' property or of the Debtors' in property.

114.    As of the Petition Date, and at the time of the relevant transfers, the Debtors

had one or more unsecured creditors that had the ability to avoid transfers such as, without

limitation, the Avoidable Transfers.

115.    Upon information and belief, the Avoidable Transfers were made to or for the

benefit of Defendants without fair consideration.

116.    Upon information and belief, the Avoidable Transfers were not made in good

faith.

117.    Upon information and belief, as of the date of the Avoidable Transfers, the

Debtors (i) were insolvent or were rendered insolvent at the time or as a result of such

transfers; (ii) had unreasonably small capital for the business in which they were engaged or

were about to engage, and/or (iii) intended to incur, or believed that they would incur, debts

beyond their ability to pay as such debts matured.

118.    Accordingly, upon information and belief, pursuant to 11 U.S.C. §544(b) and

550 and sections 273, 274, 275 and 278 of the New York Debtor and Creditor Law, the

Administrator may avoid and recover from the Defendants the amount of the Avoidable

Transfers to be determined at trial, plus interest thereon, and the costs and expenses of this

action.

## <u>SECOND CLAIM FOR RELIEF</u>

(Avoidance and Recovery of Actual Fraudulent Transfers of Money and Property and
Preserve Same for the Benefit of the Estates Pursuant to New York Debtor and Creditor Law
§§ 276 and 278, and Bankruptcy Code §§ 544, 550(a) and 551)

119.    The Administrator repeats and incorporates by reference the allegations set

forth in the preceding paragraphs as if fully set forth herein.

120.    The Administrator brings this claim against the Defendants pursuant to

Sections 544, 550 and 551 of the Bankruptcy Code and Sections 276 and 278 of the New

York Debtor and Creditor Law.

121.    The Avoidable Transfers constitute a transfer or transfers of an interest or

interests in the Debtors' property or of the Debtors' in property.

122.    As of the Petition Date, and at the time of the relevant transfers, the Debtors

had one or more unsecured creditors that had the ability to avoid transfers such as, without

limitation, the Avoidable Transfers.

123.    The Purchase Price for the Transactions was based upon financial records and statements of the Predecessor Companies, as provided to their auditors or accountants by certain of the Defendants.

124.    Upon information and belief, certain of the Defendants fraudulently and intentionally misrepresented certain financial data to their auditors or accountants to artificially inflate the value of the Predecessor Companies.

125.    Upon information and belief, the Defendants provided their auditor with inaccurate financial information, including but not limited to significantly overstated profits and significantly understated costs associated with past sales, including revenues owed to joint ventures and royalty payments owed to vendors.

126.    As a result of the foregoing, the Predecessor Companies' financial statements and balance sheets routinely included inflated profit figures, and as a result, the financial statements used in preparing the valuations of the Predecessor Companies in relation to the Transactions reflected costs that were significantly lower than actual costs and profits that were significantly higher than actual profits.

127.    Relying upon these inaccurate financial records, the financial projections, which served the basis for the Transaction, incorrectly showed that the Debtors would be able to repay the increased debt obligations incurred in connection with the Transaction, and still have sufficient working capital to pay its ordinary course business obligations and necessary expansion costs.  In reality, the Transactions left the Debtors in a state of overvaluation and undercapitalization.

128.    The Avoidable Transfers of the Defendants and/or the Predecessor Companies were made with the actual intent to hinder, delay, or defraud the Debtors and their creditors.

129.     The Debtors relied upon these misrepresentations in the Transaction, all to their detriment and the detriment of their creditors.

130.     As a result of these improper and fraudulent financial reports, the Defendants received the Avoidable Transfers.

131.     The misrepresentations of the Defendants and/or the Predecessor Companies were intended to defraud the Debtors and the current and future creditors of the Debtors.

132.     Upon information and belief, the Transactions were not entered into in good faith by the Defendants.

133.     Accordingly, upon information and belief, pursuant to 11 U.S.C. §544(b) and 550 and sections 276 and 278 of the New York Debtor and Creditor Law, the Administrator may avoid and recover from the Defendants the amount of the Avoidable Transfers to be determined at trial, plus interest thereon, and the costs and expenses of this action.

## THIRD CLAIM FOR RELIEF

(Disallowance and/or Subordination of Claims Pursuant to Bankruptcy Code §§ 502 and 510)

134.     The Administrator repeats and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

135.     Certain of the Defendants have asserted claims against the Debtor in connection with the Bankruptcy Case (collectively the "Claims").

136.     For the reasons stated above, the Administrator believes the Claims of the Defendants should be subordinated in accordance with Section 510 of the Bankruptcy Code.

137.     Pursuant to 11 U.S.C. § 502(d), in the event Claims are not otherwise subordinated, expunged or disallowed, and/or Defendants assert other claims against the Debtors' estates, then the Administrator is entitled to judgment and/or order disallowing the

Claims and any other claims asserted by or to be asserted by Defendants against the Debtors'

estates, unless and until the Defendants pay to the Administrator any and all amounts for

which each such Defendant is liable under 11 U.S.C. § 550(a), including, but not limited to,

the aggregate amount of the Avoidable Transfers received by the Defendants.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an order:

(i) on the First Cause of Action, pursuant to Sections 544 and 550(a) of the

Bankruptcy Code and Sections 273, 274, 275 and 278 of the New York Debtor and Creditor

Law, determining that the Avoidable Transfers constitute fraudulent conveyances and are

subject to avoidance, and entering judgment for recovery against Defendants in the total sum

of the Avoidable Transfers, plus interest thereon; and

(ii) on the Second Cause of Action, pursuant to Sections 544 and 550(a) of the

Bankruptcy Code and Sections 276 and 278 of the New York Debtor and Creditor Law,

determining that the Avoidable Transfers constitute fraudulent conveyances and are subject

to avoidance, and entering judgment for recovery against Defendants in the total sum of the

Avoidable Transfers, plus interest thereon; and

(iii) on the Third Cause of Action, pursuant to Sections 502 and 510 of the

Bankruptcy Code disallowing and/or subordinating claims of the Defendants; and

(iv) awarding the Plaintiff the costs and expenses of this action and legal fees

resulting from Defendants' wrongful actions as set forth above herein; and

(v) such other, further and different relief as the Court deems just and proper.

Dated: New York, New York
      July 10, 2007

                    KLESTADT & WINTERS, LLP
                    Counsel to the Plan Administrator
                    By:/s/ Tracy L. Klestadt
                      Tracy L. Klestadt (TK-3591)
                      John E. Jureller, Jr. (JJ-4697)
                      Sean C. Southard (SS-2825)
                    292 Madison Avenue, 17th Floor
                    New York, New York 10017-6314
                    Tel 212-972-3000
                    Fax 212-972-2245